Hillsborough County Probate Court
No. 89-337

*In re* ESTATE OF ENA M. MCQUESTEN

July 23, 1990

*Law Offices of Randall E. Wilbert,* of Nashua (*Randall E. Wilbert* on the brief and orally), for the petitioners.

*Hamblett & Kerrigan P.A.,* of Nashua (*Beth H. Davis* and *Mark R. LaFontaine* on the brief, and *Ms. Davis* orally), for the petitionee.

BROCK, C.J. The petitioners were adopted by their stepfather following the divorce of their natural parents and the remarriage of their mother. They now claim a right to inherit, through their deceased natural father, from the estate of their natural paternal grandmother. The Hillsborough County Probate Court (*Cloutier,* J.) denied the petitioners' claim, ruling that the right to take by representation was terminated by the adoption. For the reasons that follow, we affirm.

Sheree L. Faucher and Cathy L. Faucher, the petitioners, were born during the marriage of their natural parents, Robert A. McQuesten and Sandra A. Faucher (formerly Sandra A. McQuesten). When the marriage ended in divorce in 1963, custody of the petitioners was given to their mother, who later that same year married Bertrand Faucher. In 1968, when Sheree and Cathy were nine and seven years old, respectively, they were adopted by their stepfather with the consent of their natural father.

In 1971, Robert A. McQuesten died intestate and, in 1979, his mother, Ena M. McQuesten also died intestate. In December 1988, the petitioners filed notices of claim with the probate court, each seeking an amount equivalent to one-fourteenth (1/14) of the value of certain real estate owned by their natural paternal grandmother at the time of her death. The court denied the petitioners' claims, ruling "that the right to take by representation through their biological parent [was] terminated by the adoption. . . ." The petitioners also filed a motion, which was not granted by the probate court, requesting access to their sealed adoption records.

On appeal, the petitioners argue that the probate court erred in denying their claims against their grandmother's estate. They con-

tend that RSA 170-B:20 creates a special exception, applicable to stepparent adoptions, which permits them to inherit through their natural father. They further contend that the termination of the right to inherit through their natural father, who openly consented to the adoption of his children by their stepfather, was not in their "best interests" and violated principles of equity. In addition, the petitioners argue that a guardian ad litem should have been appointed by the probate court at the time of adoption to protect their financial interests. Finally, they claim that "good cause" exists to unseal their adoption records because their adoption was open and uncontested and because no living party to the adoption has expressed any objection.

We first address the petitioners' claim that the adoption statute creates an exception for stepparent adoptions, allowing the adopted child to inherit from the natural parent who has been otherwise dispossessed of any parental rights, privileges, duties or obligations. The petitioners argue that the exception can be found in the wording of RSA 170-B:20, V: "When the adopting parent is a stepparent, married to a natural parent, nothing contained in this section shall affect the rights of inheritance between the child and *his natural parent* or their collateral or lineal relatives." (Emphasis added.) The petitioners assert that because the legislature did not employ the phrase "his natural parent who is married to the stepparent," as it did in RSA 170-B:20, II, it was referring to the natural parent who was not part of the adoptive marriage. We disagree.

 "Adoption was unknown at common law and is wholly statutory." *Durivage v. Vincent,* 102 N.H. 481, 483, 161 A.2d 175, 177 (1960). Therefore, our review of this claim is limited to an interpretation of what the legislature has enacted. *Young v. Bridges,* 86 N.H. 135, 138, 165 A. 272, 274 (1933). In interpreting the intent of the legislature, we look at words in the context of the statute as a whole. *State Employees Ass'n v. Cheney,* 119 N.H. 822, 826, 409 A.2d 775, 777 (1979).

RSA 170-B:20 contains five paragraphs. Paragraph I confers upon the adopted child and the adoptive parent or parents the same rights, privileges, duties and obligations, with respect to one another, as if the adopted child were born in wedlock to the adoptive parent or parents. RSA 170-B:20, I. Paragraph II, which complements paragraph I, removes from the natural parent or parents any of the rights, privileges, duties or obligations with respect to the adopted child. RSA 170-B:20, II. Paragraph II contains an exception, exempt-

ing from its provisions natural parents who are married to adoptive stepparents. RSA 170-B:20, II. Paragraphs III and IV specifically address inheritance rights. Paragraph III severs existing rights of inheritance between the adopted child and the natural parent or parents. RSA 170-B:20, III. Paragraph IV, complementing paragraph III, establishes rights of inheritance between the adopted child and the adoptive parent or parents. RSA 170-B:20, IV. Paragraph V is composed of several sentences, each dealing further with the effect of adoption upon testate or intestate property distribution. *See* RSA 170-B:20, V.

It is one of the sentences of paragraph V which provides the fuel for the petitioners' argument. The sentence calls for the continuation of inheritance rights, which would otherwise be severed by the provisions of paragraph III, between an adopted child and "his natural parent" in situations involving stepparent adoption. RSA 170-B:20, V. The question is whether "his natural parent" refers to the natural parent married to the stepparent, to the natural parent whose parental relationship with the adopted child has been legally terminated, or to both.

■ The provision clearly does not apply to both natural parents. The wording, "his natural parent," is in the singular. The adoption statute consistently makes reference to "natural parent or parents" where inclusion of both the natural father and the natural mother is intended. *See* RSA 170-B:20, I–V. If the legislature had sought to continue the inheritance rights between the adopted child and both natural parents, it undoubtedly would have employed similar language.

In determining which natural parent is referred to as "his natural parent," it is logical that the legislature would intend to preserve inheritance rights between an adopted child and the natural parent with whom he or she continues to have a familial relationship. This would be consistent with the exception contained in paragraph II. *See* RSA 170-B:20, II. Furthermore, it would be illogical to conclude that the legislature intended to continue inheritance rights between an adopted child and a natural parent who has had all other parental rights, privileges, duties and obligations legally terminated. *See* RSA 170-B:20, II, III.

■■ In interpreting the adoption statute as a whole, we conclude that RSA 170-B:20, V allows the inheritance rights between the adopted child and the natural parent married to an adopting stepparent to remain unaffected by the adoption. It does not create

an exception whereby inheritance rights may be preserved between an adoptive child and a natural parent who has been legally dispossessed of any continuing parental rights or duties.

Next, we consider the petitioners' claim that, despite the intent of the legislature, as expressed in the adoption statute, this court should promote their "best interests" and permit them to inherit from the estate of their natural paternal grandmother. The basis for making such a ruling, as argued by the petitioners, is that theirs was an "open" adoption, entered into with the knowledge and consent of their now deceased natural father. They argue that they should be permitted to inherit from their natural parents as well as their adoptive parents, which would be the result if this court applied principles of fairness and equity. We disagree.

We begin our review of this claim by noting that RSA 170-B:20, III–V, the provisions which address rights of inheritance after adoption, do not differentiate between cases based upon whether an adoption is "open" or whether parental consent was obtained. We further note that the only interest which the petitioners have asked us to promote is their claim to a portion of their late grandmother's estate.

■ We have previously addressed the petitioners' argument regarding the fairness and equity of permitting adopted children to inherit from both adoptive and natural parents and have held "that for the purpose of inheritance of property by heirship the adopted child becomes the child of the adopting parents and ceases to be the child of the natural parents, the reason being to avoid the *unfair* result of giving a dual right of inheritance to an adopted child as against the single right of a child not adopted to inherit from his blood kin only." *Amoskeag Trust Co. v. Haskell,* 96 N.H. 89, 98, 70 A.2d 210, 217 (1950) (citing *Young v. Bridges,* 86 N.H. at 138, 165 A. at 275) (emphasis added). This reasoning remains sound today. While an adopted child may lose rights of inheritance from natural parents, he or she gains rights of inheritance from adoptive parents. RSA 170-B:20, I. At the same time, natural parents are not prevented from making testamentary provision for their children who are adopted, should they so desire. RSA 170-B:20, V.

The right of inheritance is also controlled by statute. *See* RSA ch. 561. The right is of no immediate value until a relative dies and the deceased relative's assets, by operation of the descent and distribution statutes, become vested in the heir. A relative can disappoint a potential heir by conveying his or her life's bounty through testamentary disposition or *inter vivos* transfer to other parties, or by

simply expending his or her resources during his or her lifetime. While the right of inheritance provides the opportunity for an heir to be enriched by the demise of a relative, we cannot adjudge one right of inheritance to be more valuable than another.

We see no unfairness or inequity in terminating the right of inheritance through a natural parent in substitution for granting a new right of inheritance through an adoptive parent. In the petitioners' situation, it may be in their best *financial* interest to inherit from their natural grandmother. But it is not the purpose of the adoption statute to create financial advantages for the adopted child. *See* RSA 170-B:1. The statute already considers the respective interests of the adopted child, adoptive parents and natural parents in the adoption process. *See id.* Because the statute provides a clear solution in the interest of all parties, we need not apply equitable principles to reach a contrary result. *Smith v. Consul General Of Spain,* 110 N.H. 62, 64, 260 A.2d 95, 97 (1969).

Next, the petitioners claim that the failure of the probate court to appoint guardians ad litem to represent their financial interests during the adoption proceeding amounted to a denial of due process and the unprivileged taking of their property in violation of the New Hampshire Constitution, part I, article 15. We find no merit in this claim.

■■ The petitioners were not dispossessed of the right to inherit. For purposes of inheritance, the adoption changed only their familial association, exchanging their inheritance right through their natural father for the right to inherit through their adoptive father. Their natural father and his relatives retained the right to make testamentary dispositions to the petitioners. As stated earlier, the right to inherit has no immediate value, providing opportunity for gain only under fortuitous, and often bittersweet, circumstances. The petitioners had no property taken from them at the time of their adoption, and the State Constitution was not violated. The probate court did not err in failing to appoint guardians ad litem to represent the petitioners' financial interests.

Finally, the petitioners claim that an "open" adoption constitutes "good cause" for permitting the probate court to unseal their adoption records. They argue that the contents of their records should be revealed because the adoption was uncontested and none of the parties to the adoption has expressed an objection. They argue that such disclosure would not be detrimental to the welfare of any of the parties or to the public interest.

██ Adoption records are subject to inspection only upon written consent of the court for good cause shown. RSA 170-B:19, II. Confidentiality protects the interests of all parties involved in the adoption. J. Bianco, Jr., M. Chamberlain, C. DeGrandpre, *The New Hampshire Adoption Statute: An Overview,* 18 N.H.B.J. 227 (1977). Beyond the parties to the adoption, the State also has an interest in maintaining closed records. *Id.* at 234–36. It is in the interest of the State to prevent public disclosure of potentially embarrassing information it may have acquired regarding the parties and to avoid outside interference with the adoptive family unit and the social development of the adopted child. *See id.* at 227. The term "good cause" has not been defined by statute. *Id.* at 228. However, in order to show "good cause why a record should be opened," an adoptee bears a heavy burden. *See id.*

██ If all of the parties to the adoption give their consent to unsealing the adoption records (here we note that the petitioners' deceased natural father cannot give his consent), the State still has an interest in continued confidentiality. Even in a so-called "open" adoption, where consent has been voluntarily given by a natural parent to terminate his parental rights, court records could contain potentially embarrassing information and be disruptive to the relationship between children and their adoptive parents. Although we do little in this opinion to clarify the term "good cause," we recognize that it must be more than the mere consent of the parties to the adoption. The probate court did not err in failing to grant the petitioners' request to unseal their adoption records.

*Affirmed.*

HORTON, J., did not sit; the others concurred.