Kimball v. State, No. 562-8-08 Wrcv (Eaton, J., Apr. 14, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
WINDSOR COUNTY, SS

| | |
|---|---|
| Tomas E. Kimball<br><br>v.<br><br>State of Vermont | SUPERIOR COURT<br>Docket No. 562-8-08  Wrcv |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Petitioner Tomas Kimball seeks post-conviction relief on the ground that he received ineffective assistance of counsel during his trial for sexual assault on a minor and furnishing alcohol to a minor. A merits hearing was held on December 15th and 16th, 2009. Petitioner was present and represented by attorney Melvin Fink. The State of Vermont was represented by State's Attorney Robert Sand. The court makes the following findings of fact and conclusions of law based on the credible evidence presented at the hearing.

Findings of Fact

The underlying incident took place in January 2003. Petitioner was sharing his house with his girlfriend, April Zullo. She invited a friend of hers named E.D. to come over to the house. E.D. was thirteen years old at the time. The friendship between Zullo and E.D. was based on a prior relationship between Zullo and E.D.'s father.

At the house, petitioner furnished alcohol to E.D. and sexually assaulted her. Zullo participated in the assault by holding E.D.'s hand and touching her vagina. It was not reported at the time.

Some months later, Zullo became pregnant by petitioner, but they broke up before the child, M.K., was born. Zullo and petitioner then became embroiled in a bitter custody dispute in New Hampshire. Zullo wanted sole custody of the child and made a number of accusations against petitioner in connection with the family court case. Zullo also persuaded E.D. to come forward and speak with police about the January 2003 sexual assault. E.D.'s subsequent disclosure, which took place in approximately April 2005, led to the underlying criminal proceedings.

Petitioner was charged in June 2005 with sexual assault on a minor and furnishing alcohol to a minor. He was represented throughout the proceedings by several different assigned counsel. Attorney Matthew Branchaud took over the case about six months before the jury trial. He had been admitted to practice in 2005, and this was his first jury trial. Another attorney from Branchaud's office provided some assistance during the first day of trial but was not an active trial participant.

Branchaud's theory of the case was that the allegation of sexual assault was fabricated by or with the help of Zullo in order to further Zullo's interests in the child-custody dispute. Zullo was a central figure in the case. She purported to be an eyewitness to the assault as well as a co-perpetrator. She also had a close relationship with E.D.

As part of the defense, it was imperative to explain why Zullo would fabricate the incident. Branchaud's trial strategy was to show that Zullo had gone to great lengths in the past in order to portray petitioner as a sexual deviant and gain an advantage in the family-court case. Specifically, she had accused petitioner of improperly touching M.K. and expressing sexual desire towards M.K. and other underage children. Zullo had alleged other misconduct as well, and had also encouraged E.D. to come forward at a late hour to report the sexual assault. Branchaud thought that the jury would see these allegations as incredible and therefore conclude that Zullo not only fabricated the allegations of sexual assault against E.D., but also persuaded E.D. to take part in the scheme. The theory was to show that Zullo was making up allegations against petitioner so he would be denied any role in M.K.'s life.

Rather than try to exclude other incidents of misconduct, Branchaud hoped to implement his strategy by encouraging Zullo to testify to so many different and outrageous allegations that she lost her credibility with the jury. He formulated this strategy with petitioner's input and assent. Both felt that they could create reasonable doubt about the whole event by discrediting Zullo.

E.D. was the central witness at trial. She described the sexual acts and the furnishing of alcohol. Zullo then testified under a grant of immunity about her role in the incident. Finally, there was another witness, named Christopher Armstrong. He was a friend of petitioner's who testified that petitioner had bragged to him about having sex with E.D. Petitioner did not testify in his own defense.

The jury returned guilty verdicts on both counts on June 1, 2006. District Court Judge Theresa S. DiMauro presided over the jury trial.

Petitioner then negotiated a resolution of several pending dockets. The plea agreement contained a waiver of any direct appeal from the trial convictions. Petitioner was accordingly sentenced in November 2006 to serve 8 to 20 years on the sexual-assault conviction. He also received concurrent sentences of 1 to 2 years on the furnishing-alcohol conviction and 1 to 5 years on another lewd-and-lascivious-conduct conviction (to which petitioner had pled no contest as part of the global resolution).

Petitioner now claims that he received ineffective assistance of counsel in several respects. He contends that Branchaud failed to (1) interview a witness in a timely fashion, (2) fully pursue past untruthful statements made by Zullo, (3) object to Zullo's testimony about petitioner's sexual misconduct towards M.K., (4) object to Zullo's testimony that she was physically assaulted and perhaps raped by petitioner, and (5)

2

adequately explain to him what it meant to waive his direct appeal of these issues as part of his plea agreement.

Petitioner retained George Ostler, Esq., as an expert witness in support of his post-conviction claims. Ostler has extensive experience in criminal law. He graduated from Dartmouth in 1977 and from Vermont Law School in 1983. He has practiced criminal law since his graduation from high school. He mostly does criminal defense work, and the majority of that work is in New Hampshire.

The state's expert was former Windham County State's Attorney Dan Davis.

Ostler reviewed the trial transcript, the trial counsel's file, the pleadings, the transcript of the motion hearings, and a statement made by the witness whom Branchaud allegedly failed to interview (Justin Backus). Ostler feels that he was able to review what was necessary in order to formulate his opinion that errors affecting the outcome of the trial were made in several respects.

One of the charges against petitioner was sexual assault. Ostler believes those cases are among the most difficult to try in criminal law. They are complicated and require a high degree of competence. While not directly stated, Ostler's testimony can be fairly understood to question the propriety of an attorney with no prior jury experience undertaking a sexual assault on a minor trial as his first jury case.

Ostler was critical of Branchaud's performance in some general areas, such as the effectiveness of the opening statement and the closing argument. In particular, Ostler was critical of Branchaud's choice to reference petitioner's alleged misconduct with M.K. in the opening statement, and to describe the subsequent medical examination of M.K. as having been "inconclusive." Ostler felt that was dangerous. Yet Ostler's general concerns about these topics fell short of an opinion that Branchaud's performance in these areas fell below acceptable professional standards.

Ostler delineated five specific areas where felt that Branchaud's trial performance fell below acceptable professional standards, thus rendering petitioner's assistance of counsel ineffective and affecting the outcome of the trial. These areas are as follows.

*1. Failure to Interview and Call Witness.* Zullo testified at trial that one Justin Backus appeared at petitioner's home on the night in question, but that petitioner told Backus to leave because petitioner was "about to get what he'd always wanted." Zullo's testimony was contradicted at trial by E.D., who testified that she did not see Backus on the night on question. Branchaud pointed out that discrepancy to the jury.

Backus lives in White River Junction and is a long-time friend of petitioner's. He lived near petitioner and had been to his house many times. He now says that he was not at petitioner's house on the night in question. It is unclear, and Backus was not asked, how he could pinpoint the night of the sexual assault when the assault itself was not reported until approximately April 2005, almost two and one half years after the incident.

3

Branchaud thinks (but is not certain) that he spoke with Backus by telephone during trial preparation. In any event, he recalls that he discussed the possibility of Backus's testimony with petitioner but that petitioner was not getting along well with Backus at the time of trial. The assessment was that his testimony would not be helpful, so they made a joint decision not to call Backus as a witness.

Petitioner remembers that conversation differently. He agrees that they discussed Backus but maintains that he wanted to call Backus as a witness.

For his part, Backus denies having been contacted by Branchaud. He did not attend the trial and he was not called as a witness.

Petitioner's mother approached Backus in July 2006 and asked him why he had not been at the trial. He wrote out a statement for petitioner at her request. (P. Ex. 1) In the statement, Backus denies having been at petitioner's house on the night in question and having been asked to leave.

Ostler views Backus as a central and important witness because he would have contradicted Zullo's testimony. He believes that Backus should have been interviewed and called as a witness. He also believes that witnesses must be interviewed early while their memories are fresh, so that it is known what they will say, and so that other possible leads can be discovered.

Ostler did not comment on the effect of the two-year delay in reporting on his opinion that witnesses must be interviewed early. Nor did he mention that E.D. had directly contradicted Zullo's testimony by stating that she had not seen Backus on the night in question.

Davis felt that the failure to call Backus made no difference because E.D. contradicted Zullo's testimony, and Branchaud pointed out the discrepancy to the jury. Moreover, although not noted by Davis, Zullo admitted in her own testimony that she had drank alcohol and had possibly been impaired on the night in question. Hence, even without Backus's testimony, the jury heard at least two reasons why they should question Zullo's testimony about whether Backus had come to the house.

In the final analysis, the court finds it credible that Branchaud never contacted Backus before trial. This assessment is based upon Branchaud's own expressed uncertainty, Backus's testimony, and the fact that there were not any notes in the trial file regarding discussions between Backus and Branchaud.

Yet the court also finds it credible that Branchaud discussed the option of calling Backus with petitioner and petitioner's mother, and that petitioner agreed that Backus should not be called. Here, the court notes that petitioner was asked during his Rule 11 colloquy whether he was satisfied with his attorney's advice. He had an opportunity then to tell the judge that his attorney had failed to call an important witness. He did not do

so. It is inconceivable to the court that petitioner would not have told the trial judge that his attorney had disregarded his wishes and failed to call a central witness at his trial.

It follows that Branchaud's decision not to call Backus as a witness did not fall below the professional standard of care.

*2. Failure to Admit Evidence of Zullo's Prior False Statement.* Zullo was convicted in New Hampshire in 2002 for making a false statement to police. She had apparently told police that petitioner had threatened to shoot someone, and this resulted in petitioner's arrest. She later recanted. As a result, she was charged with and convicted for unsworn falsification, which is a misdemeanor under New Hampshire law. The conviction was subsequently annulled by a New Hampshire court.

Zullo's conviction was the subject of a motion in limine in petitioner's trial. Branchaud argued unsuccessfully that he should be permitted to use the conviction under Rule 609 despite its annulment. The trial court ruled that the fact of conviction was inadmissible under Rule 609 because the conviction was annulled.

Branchaud then argued that the making of the statement itself was a prior bad act under Rule 404(b). Inexplicably, however, he never argued (except obliquely) that the false statements themselves were admissible under Rule 608(b), or that the false statements were admissible as evidence of Zullo's bias.

Zullo's prior statements probably could have come in under Rule 608(b). Branchaud referenced that rule in his presentation to the trial judge but did not put forth a cogent argument as to why the statements were relevant to the criminal case. Nor did he mention a New Hampshire case by the name of *Brown v. Brown*, which makes clear that the annulment statute "only extends as far as evidence of the conviction itself" but does not "prohibit introduction of the underlying facts and circumstances giving rise to the conviction." 133 N.H. 422, 426 (1990) (citation omitted). Branchaud was not aware of the *Brown* decision at the time of trial. Even without regard to the New Hampshire decision, however, the Vermont Rules of Evidence provide a basis for the use of the previous statements of April Zullo, since those statement went to her truthfulness, and bias.

It is likely that Branchaud was concerned about the consequences of getting into the actual statements underlying the conviction. Doing so might have opened the door to more discussion about the allegedly domestically violent relationship between Zullo and petitioner, and might have led to Zullo testifying about why she made the false statements (she was afraid of petitioner and might have even testified about actual incidents of prior domestic assault). The trial court cautioned Branchaud against opening these doors.

Of course, it is speculative whether the trial court would have actually admitted the so-called "context evidence" to explain Zullo's statements, since she was not the victim of the crime. And even if the "context evidence" had been admitted, any

5

downside would have been tempered by the fact that it was Branchaud's trial strategy to elicit so many allegations from Zullo that she lost credibility with the jury.

The more important point here is that Branchaud was trying to show that Zullo would go to any lengths to harm petitioner. These statements were very relevant for that purpose: they were statements made by Zullo for the specific purpose of getting petitioner arrested.

In the end, Branchaud did not make a forceful argument to the trial judge to support the admissibility of the statements as evidence of bias or as impacting upon Zullo's credibility. He was too focused on the use of the conviction itself rather than the use of the statements giving rise to the conviction. The conviction itself was beside the point. It should have been enough that Zullo admitted that she made a false statement against petitioner for the purpose of exposing him to criminal charges. That is what should have been the focus of Branchaud's arguments. His failure to pursue this more fully was error on his part.

In addition, there may have been an acknowledgment by Zullo of untruthfulness either orally or in a written document at the change of plea hearing in New Hampshire. Branchaud never explored whether any such statement existed or whether he could have used it despite the annulment of the conviction.

*3. Failure to Object to Testimony About Other Sexual Misconduct.* One of the thorniest issues at trial was the delay between the incident and the reporting. Zullo testified that she encouraged E.D. to report because she had become concerned that petitioner had improperly touched M.K. She said she found redness in M.K.'s vaginal area and that this had been investigated by Dartmouth-Hitchcock but that the results had been inconclusive. She also testified that petitioner made inflammatory statements when he looked at the ultrasound picture of M.K. to the effect that he wanted to have sex with M.K. and her friends when they turned thirteen.

Branchaud purposely did not object to this line of testimony. In fact, he brought some of it out through his own questioning as part of his defense strategy to encourage Zullo to make so many allegations as to seem incredible to the jury. He wanted to show that Zullo's motive for all of the sexually-related allegations was to remove petitioner from M.K.'s life.

Ostler is critical of this strategy and how it was implemented. He believes that this testimony was highly inflammatory and prejudicial. It was, and it likely would not have come in if objection had been made. See *State v. Smith*, 2010 VT 15, ¶ 9 (explaining that evidence of uncharged sexual misconduct in a sexual-assault case is "the most prejudicial evidence imaginable because of its significant potential to alter the jury's deliberative calculus") (quoting *State v. McCarthy*, 156 Vt. 148, 155 (1991)).

A more seasoned attorney might have approached this evidence in a different manner, such as by deciding that the risk of unfair prejudice outweighed the possible

6

benefit that the jury might find the testimony incredible. Or a more seasoned attorney might have avoided word choices like "inconclusive."

The defense strategy was questionable for these reasons, but it did not fall below professional standards. Ostler agrees that it was essential to discredit Zullo, since she was an independent eyewitness whose testimony corroborated E.D.'s. Moreover, the role that Zullo played in encouraging E.D. to report the incident to police was an obvious point of attack for the defense. The infusion of inflammatory allegations from the child-custody case was part of the effort to create reasonable doubt. It is plausible that reasonable jurors might have considered the allegations about ultrasound pictures and the reported sexual misconduct to be so outrageous as to be unworthy of belief (especially given their timing and context). If the jurors concluded that Zullo was willing to lie about such things in order to get petitioner in trouble and gain an advantage in the child-custody dispute, it would have been a short leap for them to believe that the instant allegations were similarly motivated, and hence outrageous and unbelievable.

As Davis opined, it was not unreasonable for Branchaud to determine that he should attack Zullo's testimony on these points and that he should proceed in the manner that he chose. It does not mean that the strategy was unprofessional if another attorney might have employed a different approach, or if hindsight reveals that the chosen approach did not pay off.

*4. Lack of Objection to Testimony About Past Physical Abuse.* Zullo testified that she had been physically assaulted by petitioner and that she was "afraid she would wind up dead." Branchaud objected to the latter statement but not the former testimony. Both experts agreed that the statements were harmful to the defense. It was not necessary to get into these areas in order to effectuate the trial strategy described above. As Ostler opined, evidence of other assaultive behavior is prejudicial in a sexual assault trial, and Branchaud should have objected.

In addition, although not mentioned by the experts, the prosecutor questioned Zullo without objection about whether she had sought a restraining order in the New Hampshire courts.

It is true that there are sometimes strategic reasons not to object, as when an objection would merely highlight particular evidence for the jury. But the information concerning past physically-assaultive behavior by petitioner against Zullo was damaging, and strategic decisions about whether or not to object should not have played any role in relation to this testimony. Branchaud should have objected. He admits that his inexperience played a role in his failure to object in some instances. This appears to have been one of them.

It is unclear, of course, whether the trial judge would have overruled the objection and admitted the evidence as providing context for the relationship between petitioner and Zullo. But at the very least, trial counsel should have made an effort to keep this testimony out of evidence.

7

Zullo also testified that she took E.D. home following the sexual assault and that, upon her return, petitioner grabbed her by the throat. There was no objection to this testimony, but it was a description of the events that transpired on the night of the incident and thus it is quite possible that the testimony would have been allowed even if objection had been made. Branchaud did attempt to discredit Zullo on cross-examination about her fear of petitioner and whether she was really grabbed by the throat or not, but this was largely ineffective.

Petitioner also contends that Zullo testified that he had raped her and that Branchaud failed to object to this. A careful review of the trial transcript does not support that contention, however. Zullo testified that petitioner used a condom during times when they were not supposed to be together so that there would be no evidence if she decided to "call rape" on him. Her testimony was not an accusation of rape that should have drawn an objection from Branchaud.

5. *Waiver of Appellate Rights*. Petitioner also contends that he was not properly advised by his attorney concerning his right to appeal before entering into the plea agreement. In essence, he argues that he would not have taken the plea agreement if he had not been convicted (and that he would not have been convicted if he had been properly represented). He also argues that his appellate rights were not fully explained to him before entering into the plea agreement, and that his waiver was therefore not knowing and voluntary.

Ostler did not have access to any discussions between petitioner and Branchaud concerning the appellate rights, but nevertheless opines that it was professionally improper for Branchaud not to discuss the strength of a possible appeal and the appellate issues with petitioner. He thinks there were clear appellate issues in this case.

It is beyond dispute that an attorney should explain the issues on appeal and the strength of those issues in order for a client to make an intelligent decision about waiver of appellate rights. Such discussions are clearly necessary. Yet Ostler's opinion overlooks the fact that petitioner acknowledged in his Rule 11 colloquy that he had reviewed the plea agreement with his attorney and that he was satisfied with the advice he received from his attorney before entering into the plea agreement. It also disregards Branchaud's testimony that appellate issues were discussed with petitioner before the agreement was reached.

At the time he accepted the plea agreement, there was no agreement as to the sentence on the charges for which he had been convicted. Petitioner was also facing exposure on another felony charge with the possibility of consecutive time to serve. The impact of additional time beyond that agreed to in the plea agreement on the convicted charges *as well as* the possibility of consecutive time on additional charges must both be considered when calculating the benefits of the plea agreement.

It cannot be gainsaid that petitioner received a substantial benefit from the plea agreement. He received a sentence that was far less than his potential exposure absent the agreement. He waived his appellate rights as part of that agreement.

Branchaud testified that he discussed the waiver of appellate rights with petitioner along with other aspects of the plea agreement, and the court finds this to be credible. After conviction, petitioner wanted to get things over with. Petitioner says that they discussed appellate issues for only five minutes before he accepted the plea agreement, but that is not credible in light of his statements during the Rule 11 colloquy, when he stated that there had been no inability to fully discuss the issues. He acknowledged on the record that he had the opportunity to review the plea agreement, and that he was satisfied with the advice of his attorney. The court so finds.

Conclusions of Law

On a petition for post-conviction review, petitioner bears the burden of showing "by a preponderance of the evidence that one or more fundamental errors rendered his conviction defective." *In re Hemingway*, 168 Vt. 569, 570 (1998) (mem.). A claim for ineffective assistance of counsel is reviewed by asking first whether "counsel's performance fell below an objective standard of reasonableness informed by prevailing professional norms," and second, whether "counsel's deficient performance prejudiced the defense." *In re Dunbar*, 162 Vt. 209, 212 (1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)); *In re Russo*, 2010 VT 16, ¶ 16.

In assessing whether counsel's performance fell below an objective standard of reasonableness, the court "is not permitted to judge from hindsight whether tactical decisions are ultimately successful." *In re Pernicka*, 147 Vt. 180, 183 (1986) (quotation omitted). Instead, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The ultimate inquiry is whether counsel's decisions were "within the range of competence demanded of attorneys in a criminal case at that time." *Dunbar*, 162 Vt. at 212 (quoting *In re Mecier*, 143 Vt. 23, 31–32 (1983)).

Here, the first impression upon reading the transcript is that many unprofessional errors were committed during the course of the trial. In particular, there were multiple references to uncharged sexual misconduct of the type that is normally inadmissible at trial. Cf. *State v. Smith*, 2010 VT 15, ¶ 9 (mem.) (quoting *State v. McCarthy*, 156 Vt. 148, 155 (1991)). Even a cursory review of the transcript is enough to provoke serious discomfort.

Yet it was essential for the defense to cast doubt upon the motivations of Zullo and E.D. in reporting the incident to the police. Zullo's role in encouraging E.D. to report the assault to police officers represented a vulnerable point of the state's case, since it happened at the time when Zullo had the most to gain in her child-custody dispute

with petitioner. It was reasonable for defense counsel to chip away at that link, because doing so held the possibility of discrediting both Zullo and E.D.

The details of this were messy. Zullo encouraged E.D. to report by telling her that petitioner was sexually abusing M.K. and that E.D. needed to come forward in order to prevent further abuse. Zullo drove E.D. to the police station. It was important for defense counsel to bring that out so that the jury would have some reason to believe the defendant's theory of the case.

Moreover, once some of the allegations were out there, it was reasonable for defense counsel to attempt to dilute their impact by encouraging Zullo to make as many outrageous allegations as possible. It is sometimes appropriate strategy to reveal the incredibility of a witness by letting them bluster on the witness stand.

Yet more experienced defense counsel might have drawn different lines here. It was perhaps possible to gloss over the details of the child custody dispute and focus on the fact that Zullo had made false statements to the police in the past for the purpose of getting petitioner in trouble. Such would have surely been the preferable approach if Zullo had been the victim and the only witness. But she was not the only witness, and she was not the victim. Too much gloss here might have left the jury without an explanation for why E.D. would have agreed to fabricate the allegations. Moreover, it was the very outrageousness of the allegations that could have led the jury to believe that they were fabricated, and that the allegations of sexual assault were part of the same pattern of lies.

On the whole, the trial transcript demonstrates several instances where the inexperience of Branchaud was apparent. In particular, the opening statement, the closing argument, and the cross-examination of Zullo were not as effective as they might have been. That being said, the theory of the case was laid out, and the trial strategy was followed during the course of the trial.

In the end, therefore, it was not unprofessional for Branchaud to pursue this overall theory of the case, and his choice of defense strategies did not fall below the standard of professional competence. It follows that it was not unreasonable for Branchaud to elicit the references and allegations about other sexual misconduct involving M.K. The allegations were certainly inflammatory, but they were part and parcel of the defense theory of the case: Zullo fabricated the allegations in order to gain an advantage in her child custody case, and Zullo persuaded E.D. to go along with the story.

Branchaud's execution of the defense strategy was unprofessional in other respects, however. He failed to admit evidence of Zullo's prior false statements, and he failed to object to the references to past physical abuse. These failures fell below the "objective standard of reasonableness informed by prevailing professional norms." *In re Dunbar*, 162 Vt. 209, 212 (1994).

As a result, the court must consider whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Here, petitioner's case at the merits hearing largely, if not completely, omitted discussion of the impact of the testimony of E.D. and Christopher Armstrong on his convictions. As Davis correctly indicated in his testimony, the sexual assault charge did not rise or fall solely on the testimony of April Zullo. Rather, the testimony of E.D. and Armstrong provided very strong evidence for the state's case.

First and foremost is that E.D. testified about what happened to her. She was in the courtroom and the jury was able to see her. Her testimony was straightforward and descriptive. She offered intimate and painful details about her life, and there was no apparent reason why she would have been fabricating these details at trial. (Her friendship with Zullo had waned by the time of trial to the point that she no longer had any interest in protecting her or involving herself in the child-custody dispute.) Her testimony was not impeached on cross-examination, and the prosecutor emphasized her testimony in the closing argument. It was not at all unreasonable for the jury to find her to be a credible witness, and none of the unprofessional errors affected the weight or impact to be afforded her testimony.

Second, Christopher Armstrong testified that petitioner bragged to him about having sex with E.D. This was very strong evidence of guilt since it came directly from defendant and corroborated E.D.'s story. By admitting to having sex with E.D., defendant admitted to all of the essential elements of the offense. It was not necessary to prove lack of consent in this trial, because E.D. was a minor at the time of the sexual assault. This testimony directly refuted the defense theory of the case, and there was no showing that Armstrong had any motivation to lie.

It would be one thing to convince a jury that Zullo was being untruthful. It is quite another to convince the jury that Zullo, E.D., and Christopher Armstrong were all being untruthful. This is especially true where there was no apparent reason for the latter two to assist Zullo by testifying falsely at trial.

The failure to admit evidence of Zullo's prior false statements affected only her testimony. For the foregoing reasons, the jury could have entirely discredited Zullo and there still would have been ample evidence to support a guilty verdict in this case.

The failure to object to references of past physical abuse presents an overall risk of harm, but it must be weighed in the balance. It was damaging testimony to be sure, but the prejudicial impact of the statements was mitigated by the fact that defense counsel was actively trying to elicit outrageous statements from Zullo. The impact of additional testimony about the relationship between petitioner and Zullo was very diluted.

At the end of the day, E.D. described the sexual assault to the jury. Her testimony was unimpeached by the defense, and it was corroborated by petitioner's own admission of guilt. The petition for post-conviction relief has shown that there were unprofessional

errors at trial, but the credible evidence did not establish any reason why the jury should have ultimately disbelieved these two witnesses.  It is clear that the jury believed E.D.

Thus, petitioner has proven that his counsel committed unprofessional errors at trial, but he has not proven that there is a reasonable probability that the result of the proceeding would have been different but for counsel's unprofessional errors. *Strickland*, 466 U.S. at 694.  The court must therefore conclude that petitioner has not met his burden of demonstrating that counsel's performance fell below an objective standard of reasonableness in such a way as to prejudice the defense.  *Dunbar*, 162 Vt. at 212.

## ORDER

The petition for post-conviction relief is ***denied***.

Dated at Woodstock, Vermont this _____ day of April, 2010.


_____
Hon. Harold E. Eaton, Jr.
Presiding Judge


_____
Hon. William Boardman
Assistant Judge (as to facts)