Grafton County Probate Court
No. 81-427

*In re* JESSICA W.

December 27, 1982

*Michael P. Chamberlain*, of Manchester, by brief and orally, for Anne B.

*Bossie, Kelly & Hodes P.A.*, of Manchester (*Robert F. Bossie* on the brief and orally), for George W.

BROCK, J.    This is an appeal from a decision by the Grafton County Probate Court (*Jones*, J.), dismissing a petition brought by Anne B., in which she asked the court to clarify her rights with respect to her child, Jessica W. The court ruled that RSA 170-B:10 and RSA 170-B:17 precluded any substantive consideration of Anne B.'s petition because it had been brought more than one year from the date of the child's adoption by its natural father, George W. We reverse the decision of the probate court and remand for reconsideration in light of this opinion.

In reviewing the propriety of the court's granting the motion to dismiss, we take the facts as alleged by Anne B. *Robbins v. Seekamp*, 122 N.H. 318, 321, 444 A.2d 537, 539 (1982). Anne B. and George W. became involved with one another in June 1975, and in January 1976, Anne B. discovered that she was pregnant. Shortly thereafter, the relationship between the two disintegrated and Anne B. moved in with her mother, seeing George W. only once prior to the child's birth. George W. was not present at the birth of the child and refused to have his name put on the birth certificate as the child's father. George W. saw Jessica only once in the next year and provided no child support to Anne B., who applied for and received Aid to Families With Dependent Children. Approximately one year after Jessica's birth, George W. began to visit the child and its

mother about once a month. When Jessica was almost two years old, the couple re-established their relationship and began to live together. During this period, they discussed ways of establishing that George W. was Jessica's father so that he would be legally responsible for her in the event that something were to befall Anne B. George W. consulted an attorney at this time and informed Anne B. that the lawyer had stated their only option, absent marriage, was that he adopt the child. Of course, another way that this could have been accomplished was the simple legitimization procedure provided under RSA 460:29 (Supp. 1979); *see generally* C. DOUGLAS, 3 NEW HAMPSHIRE PRACTICE: FAMILY LAW § 95 (1982).

Anne B. and George W. lived together for about fourteen months. The couple then separated, and Anne B. returned with Jessica to her mother's house. Anne B. asked George W. to look into any means by which he could assume joint responsibility for and custody of the child. He informed her, however, that the only option was for him to adopt Jessica, but assured her that she would have the same liberal visitation rights with the child after an adoption that she had previously granted him. Anne B. claims that the proposed adoption was at this and all other times understood to be a means by which George W. would *gain* a legal status vis-a-vis the child, without a corresponding *loss* of her legal status as the mother.

During this period, Anne B. entered into a state of depression and emotional instability for which she sought professional counseling. Shortly thereafter, she decided that the child would be better off if cared for by its father, given her psychological problems.

Anne B. claims that she agreed to allow George W. to adopt Jessica and assume custody of her believing that she would have visitation rights and retain her legal status as the child's mother. In February 1980, she signed the standard State "Consent to Adoption" form as well as a separate "Acknowledgment" which had been drafted by the attorney whom George W. had consulted when, as a couple, they first began to discuss establishing a legal relationship between George and Jessica. Anne B. was not represented by counsel when she signed the consent form and acknowledgment. On April 24, 1980, a final hearing on the adoption was held and a final decree of adoption was issued. *See* RSA 170-B:15, III(a); C. DOUGLAS *supra*, ch. 19.

In the following year, Anne B., or her mother, who had a close relationship with her granddaughter Jessica, saw or spoke to the child frequently. Between January 1981 and May 1981, Anne B. visited her daughter six times and spoke with her on the phone two to four times a month.

In May 1981, however, one month after the adoption decree could no longer be questioned on any grounds pursuant to RSA 170-B:17, II, George W. suddenly informed Anne B. that he was terminating her visitation rights with the child forever. Anne B. then sought counsel and on May 25, 1982, filed a petition with the probate court, asking for a clarification of her parental rights. After a hearing, that court granted George W.'s motion to dismiss the petition on the ground that Anne B.'s right to appeal or question the adoption decree in any manner and for any reason had terminated on April 24, 1981, one year from the date of the adoption decree and one month prior to the date of her petition. *See* RSA 170-B:17, II.

In her petition, Anne B. in no way questioned the validity of the adoption decree insofar as it established a legal relationship between George W. and their daughter Jessica. Anne B. also did not question George W.'s right to have custody of their daughter.

The question thus raised by this appeal is whether, in light of the unusual facts of the case, Anne B. should have had an opportunity to prove that her consent to the adoption was conditioned on her understanding that she was not thereby giving up her legal status as Jessica's mother, and that she would have some reasonable rights of visitation with the child. It is clear that to answer this question we must determine whether, regardless of Anne B.'s *actual* basis for consent, such a conditional consent, and the type of adoption arrangement thereby contemplated, can be allowed under the adoption laws of this State, RSA chapter 170-B. RSA 170-B:20 governs the effects of an adoption on the respective parties. RSA 170-B:20, II specifically provides that:

> "Upon the issuance of the final decree of adoption, the adopted child shall no longer be considered the child of his natural parent or parents and shall no longer be entitled to any of the rights or privileges or subject to any of the duties or obligations of a child with respect to the natural parent or parents; *but, when a child is adopted by a stepparent, his relationship to his natural parent who is married to the stepparent shall in no way be altered by reason of the adoption.*"

(Emphasis added.)

This statutory provision clearly fails specifically to cover this type of situation. It reflects the usual case of adoption, in which the consenting parent(s) or guardian(s) of the child *desire(s)* to sever his or her rights to and responsibilities for the child. Equally, the adopting party or parties expects and desires to have an undisturbed relationship with the child in the context of a new family unit. RSA

170-B:20, II and III therefore provide for a complete severance of all rights, privileges and obligations between a child and its natural parent or parents. The only exception to the rule that adoption severs the rights of the natural parent(s) is when a stepparent adopts the child of his or her spouse. In such cases, the rights of the natural parent remain intact. *Id.*

In the case before us, however, the adopting parent was not married to another woman at the time of the adoption; thus, the only mother the child could have when adopted was its natural mother. In addition, Anne B. claims she did not intend to give up her parental relationship with Jessica.

■ Courts in New York and New Jersey, which have statutory provisions similar to RSA 170-B:20, II and III, have held that where a natural father adopts in order to legitimize a child, but without an intended severance of the mother's rights and responsibilities, the court may treat the case as falling under the "stepparent" exceptions in the respective state statutes. *See Matter of A. J. J.*, 438 N.Y.S.2d 444, 446 (Sur. Ct. N.Y. County, 1981); *In re Adoption by A. R.*, 152 N.J. Super. 541, 545, 378 A.2d 87, 89–90 (Union County Ct. P. Div., 1977). The New York court stated:

> "Society changes and, with it, so do mores. In this era of freedom of choice and equality of rights for both parties, the child should not be denied the privilege of legitimacy as well as the care and concern of his natural mother's property and her rights of intestacy merely because these adult natural parents refuse to marry. . . .
>
> The child's best interests are served by permitting the natural father to adopt in the same manner as if the petitioning father were the stepfather of the adoptive child by marriage to the natural mother. In addition, the consenting natural mother shall not be relieved of any parental duty toward such child and the natural mother and said adoptive child shall sustain toward each other the legal relationship of parent and child, including the rights of inheritance from and through each other and the natural and adoptive kindred of such consenting natural mother."

438 N.Y.S.2d at 446.

■ We agree with the reasoning behind these New York and New Jersey cases, that a child should not have to be deprived of its relationship with its mother in order to be legitimized by its natural father through the adoption process. We conclude that interpreting

RSA 170-B:20, II liberally, in order to permit adoptions of this nature to take place, is in accordance with the legislative intent to protect, not injure, adopted children such as Jessica. As we stated in *Smith v. Consul General of Spain*, 110 N.H. 62, 260 A.2d 95 (1969):

> "[I]t is preferable to take the position of more enlightened courts, that adoption statutes are to be considered liberally, with a view to effectuating the statutory policies. Broadly those policies include promoting the best interests of children while at the same time protecting as far as possible the interests of both natural and adoptive parents."

*Id.* at 64, 260 A.2d at 97 (quoting H. CLARK, LAW OF DOMESTIC RELATIONS 614–15 (1968)).

Having determined that the adoption arrangement allegedly contemplated and consented to by Anne B. would have been a permissible one in this State, we address the argument that she can no longer raise any issues relating to the adoption because one year had already elapsed when she filed her petition with the probate court. *See* RSA 170-B:17, II.

Anne B. claims that the adoption was conceived and discussed at a time when she and George W. were living together as a couple. The attorney consulted at that time later handled the adoption proceedings. It is clear that, at the time of the adoption, he was acting solely on behalf of his client, George W.; however, Anne B. does not appear to have realized that he was not also representing her interests. Anne B. had no reason to perceive herself in an "arm's length" transaction requiring separate legal counsel when the adoption itself was something she desired so that her child would have a stable, legal relationship with the father. In addition, George W. waited until one month after the statutory deadline before refusing Anne B. her rights of visitation. She thus had no reason to raise the issue of her status and rights to visitation when, up to that time, she and members of her family had repeatedly requested, and been allowed, the previously promised visits with the child. We are not persuaded by George W.'s argument that Anne B. is barred from any relief because the statutory deadline for her to appeal or question the decree on grounds of fraud or misrepresentation had been missed by one month.

We hold that under the special circumstances of this case, equity and justice require that Anne B. be permitted to show that her consent to the adoption was conditioned by her understanding that she would lose neither her status as Jessica's legal mother, nor the visitation rights with the child that she was then exercising.

■ We stress the unique nature of this adoption by a *natural* parent. In contrast to the overwhelming majority of adoptions in this State, this couple's prior history, the fact that the adopting natural parent was not married to another woman, coupled with the course of their dealings with one another with respect to the contemplated adoption combined, make her petition for a clarification of her rights allowable.

The case is remanded to the probate court for a determination of whether Anne B.'s consent *was* conditioned on the retention of her legal status as the child's mother, and/or on some reasonable rights of visitation. Should Anne B. persuade the court that her consent was so conditioned, it should enter its decree reflecting these facts, bearing in mind that the decree of adoption itself stands, along with custody and control of the child with the father.

*Reversed and remanded.*

All concurred.