IN RE ADOPTION OF HUITZIL.

(No. CA85-06-065 — Decided December 16, 1985.)

*Baden, Jones, Scheper & Crehan Co., L.P.A.,* and *James G. Robinson,* for appellants.

*Per Curiam.* This cause came on to be heard upon an appeal from the Court of Common Pleas of Butler County.

On March 7, 1985, petitioners-appellants, Donald G. Kaufman and Patricia A. Kaufman (hereinafter "petitioners"), petitioned the Probate Division of the Butler County Court of Common Pleas for an order permitting them to adopt Hector Jose Huerta Huitzil. Huitzil is a Mexican citizen who was orphaned at the age of fifteen; when he was seven years of age his father died in an automobile accident and his mother died eight years later from cancer. While he was a minor, Huitzil came to the United States with his older brother, who had obtained a scholarship to attend Miami University, located in Oxford, Ohio. He subsequently lived with his brother in Oxford and attended LaSalle High School in Cincinnati.

Prior to reaching age eighteen, Huitzil became very close to petitioners and their family, who were also residing in Oxford. According to a memorandum filed in support of the petition for adoption, Huitzil ate meals with the Kaufman family and spent considerable time at their household. He had free access to petitioners' home and developed a sibling relationship with petitioners' children. He sought and received Mr.

Kaufman's advice on career plans and shared his personal life, including the tragic loss of both his parents, with petitioners. Huitzil was an eighteen-year-old adult at the time the subject petition for adoption was filed.

Following a hearing held on April 8, 1985 and the filing of the memorandum referred to above, the court below denied the petition for adoption and ordered that the petition be dismissed. In an opinion and judgment entry filed on May 16, 1985, the court found that even though petitioners had demonstrated that Huitzil had become emotionally, mentally and psychologically involved with them during his minority, the relationship did not constitute a child-foster-parent relationship within the reasonable ordinary meaning of the term as used in R.C. 3107.02(B)(3).[1] Petitioners thereafter timely filed an appeal to this court, and now present the following single assignment of error:

"The trial court erred in dismissing petitioners-appellants' petition for adoption."

As mentioned above, the trial judge denied the subject petition for adoption because he felt that a "child-foster-parent relationship" was not present in the case at bar within the plain and ordinary meaning of the term. In doing so, the court below relied on the venerable rule of statutory construction that the words of a statute should be given their reasonable ordinary meaning in the absence of an indication that a special meaning was intended. See *Anness* v. *United Steel Workers of America* (C.A. 6, 1983), 707 F.2d 917, 920; *State* v. *Singer* (1977), 50 Ohio St. 2d 103, 108 [4 O.O.3d 237]. Since R.C. 3107.02 is of relatively recent origin, the trial judge was denied the benefit of *stare decisis* in making his decision and was forced to rely on his own common-sense interpretation of the meaning of the term "child-foster-parent relationship." The matter is therefore deserving of further inquiry and explanation on appeal.

The right of adoption did not exist at common law and is statutory in nature. *Glass* v. *Glass* (App. 1952), 69 Ohio Law Abs. 333; *In re Peters* (1961), 113 Ohio App. 173 [17 O.O.2d 141]; *In re Martin* (App. 1957), 76 Ohio Law Abs. 219. Thus, if the requirements of an applicable statute are not met, no adoption is possible. Further, adoption statutes will be strictly construed. *Peters, supra; Martin, supra.* In Ohio, an adult who is not mentally retarded or permanently and totally disabled may be adopted only if (1) the adult consents to the adoption, and (2) a child-foster-parent or child-stepparent relationship has been established with the petitioners when the adoptee was a minor. See R.C. 3107.02 (B)(3). The latter requirement is the only one at issue in the case at bar.

In our view, a child-foster-parent

---

[1] R.C. 3107.02 reads in its entirety as follows:

"(A)  Any minor may be adopted.

"(B)  An adult may be adopted under any of the following conditions:

"(1)  If he is totally and permanently disabled;

"(2)  If he is determined to be a mentally retarded person as defined in section 5123.01 of the Revised Code;

"(3)  If he had established a child-foster-parent or child-stepparent relationship with the petitioners as a minor, and he consents to the adoption.

"(C)  When proceedings to adopt a minor are initiated by the filing of a petition, and the eighteenth birthday of the minor occurs prior to the decision of the court, the court shall require the person who is to be adopted to submit a written statement of consent or objection to the adoption. If an objection is submitted, the petition shall be dismissed, and if a consent is submitted, the court shall proceed with the case, and may issue an interlocutory order or final decree of adoption."

relationship[2] should be similar to a child-parent relationship except for the biological fact that the foster parent did not physically beget the foster child. This analysis is consistent with the definitions of the terms "foster parent" and "foster child" found in Black's Law Dictionary (5 Ed. 1979). "Foster parent" is defined as "[o]ne who has performed the duties of a parent to the child of another by rearing the child as his own child"; "foster child" is defined as a "[c]hild whose care, comfort, education and upbringing has been left to persons other than his natural parents." *Id.* at 590.

The focus of our inquiry therefore shifts to arriving at an acceptable definition of a "child-parent relationship." This is by no means an easy assignment due to the large number of factors encompassed by such a relationship and because each such relationship is unique. Further, some attributes of what we would consider to be a child-parent relationship may be present in some such relationships but not in others without diminishing the fundamental character of the relationship. We accordingly find that as a general proposition, a child-parent relationship involves all facets of raising and nurturing a child, including the provision of emotional and financial support, food, shelter, discipline, guidance, education, religious training, medical care, and love and affection. Of course, this is by no means an exclusive list, and we note that as the child matures the type of care rendered by the parent and the nature of the relationship between parent and child changes.

Turning to the case at bar, we find that the relationship between petitioners and Huitzil during the latter's minority exhibited some important attributes of a child-parent (and thus a child-foster-parent) relationship while other attributes were glaringly absent. On one hand, it is clear from the record that petitioners provided Huitzil with a great deal of emotional support after he arrived in this country as a fifteen- or sixteen-year-old orphan. They guided him and counseled him about career choices and took an interest in his school work. Further, there appears to be a great deal of mutual affection between petitioners and Huitzil, including the advent of a "sibling relationship" between Huitzil and petitioners' own children. Huitzil spent a significant amount of time at petitioners' home and ate many meals with petitioners and their children.

On the other hand, however, it appears from the record that Huitzil did not reside with petitioners at any time on a permanent basis but instead lived with his brother. There is no evidence that petitioners made substantial financial contributions toward Huitzil's general support, schooling or medical care. Further, it appears that petitioners did not raise, train and discipline Huitzil as one of their own children, although this admittedly would have been difficult due to Huitzil's relatively advanced age and the fact that he did not reside with them.

Given that the various factors discussed above do not clearly point toward either granting or denying the instant petition for adoption, we find it instructive to comment on the legislative intent behind R.C. 3107.02. Since the statute

---

[2] The nature of a child-stepparent relationship, which is the other type of relationship described in R.C. 3107.02(B)(3), is not at issue herein but would appear to be similar to a child-foster-parent relationship except that the petitioner would be or would have been at one time married to one of the parents of the individual sought to be adopted. As the issue is not now before us, we shall not comment about whether this marital relationship is enough in itself to satisfy the requirements of a child-stepparent relationship per R.C. 3107.02(B)(3).

requires a child-foster-parent or child-stepparent relationship during minority before permitting the adoption of an adult who is not mentally retarded or permanently and totally disabled, the legislature clearly did not intend that any adult be able to adopt any other adult. The statute would therefore appear to view adoption primarily as a vehicle for legitimizing relations between children and parental surrogates, the provisions of R.C. 3107.02 related to adopting adults being included merely to cover situations where, due to inadvertence, neglect or some other reason, a child reaches the age of majority before adoption proceedings are completed. If this is so, it follows that the legislature intended that the relationship established between an adopted adult and the foster parent seeking adoption during the adoptee's minority be a strong, significant one. Otherwise, there would be no reason to limit the adoption of consenting adults by other adults in any way.

Support for the above assertion may be found in an examination of the history of Ohio's adoption laws. Ohio formerly provided only for the adoption of children who were defined as "any person under twenty-one years of age." See R.C. 3107.01(A) (formerly G.C. 8004-1[A]) repealed January 1, 1977. See, also, 1 Ohio Jurisprudence 2d (1953) 631, Adoption of Children, Section 4. However, when the legislature changed the age of majority to eighteen in 1974, a group of new adults between the ages of eighteen and twenty-one were suddenly rendered ineligible for adoption. Possibly as a reaction to this event, an earlier version of R.C. 3107.02, effective January 1, 1977, provided that an adult could be adopted if (1) the adult consented, (2) a child-foster-parent or child-stepparent relationship had been established with the petitioners during the adoptee's minority, and (3) the petition for adoption was filed within three years of the date the individual became an adult. The current version of the statute, effective September 20, 1984, drops the three-year requirement but retains the other two, indicating that while the time requirement for filing to adopt adults has been liberalized, the existence of a strong child-foster-parent or child-stepparent relationship during the adoptee's minority is still important.

However, it is equally apparent that the legislature could not have intended that a child-foster-parent relationship per R.C. 3107.02(B)(3) exhibit every conceivable indicia of a child-parent relationship before rising to a level that may be legitimized by adoption since, as discussed above, the nature of such a relationship is extremely variable. For example, a foster parent or stepparent may not provide what one would consider to be proper emotional support or discipline for his or her foster children or stepchildren, but no one would deny that there is a child-foster-parent or child-stepparent relationship — it would merely be considered to be a less than satisfactory relationship. Another example might be a child-foster-parent relationship where the child was confined in a state hospital or juvenile correctional facility during a significant part of his or her minority. The foster parent may not have contributed large amounts toward the child's support or participated in training and discipline, but it is not inconceivable that a child-foster-parent relationship within the meaning of R.C. 3107.02(B)(3) might develop.

Based on the above, it is clear that the existence or nonexistence of a child-foster-parent relationship must of necessity be decided on a case-by-case basis, for any other approach would inevitably be inflexible and thus unfair. On appeal, it would seem that lower court decisions in such matters should not be reversed unless they constitute an abuse of discretion since the trial judge is in a

far better position to discuss the matter with the parties, observe the witnesses and weigh the evidence. Accordingly, since the record before us reveals that the decision of the court below was reasonable and supported by some competent, credible evidence, the decision is not an abuse of discretion and will be affirmed. Petitioners' assignment of error is therefore overruled.

The assignment of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

JONES, P.J., and HENDRICKSON, J., concur.

CASTLE, J., dissents.

CASTLE, J., retired, of the Twelfth Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Constitution.

CASTLE, J., dissenting. I must respectfully disagree with the result reached by the majority. I do agree, however, with the observation that the legislature intended that the relationship between the adopted person and the foster parents be a strong and significant one. I further agree that the legislators did not intend that the child-foster-parent relationship exhibit every conceivable indicia of a child-parent relationship. Further, it is obvious in a case of this kind that each case should be decided on its own merits, *i.e.*, a case-by-case analysis.

In my view, the record before this court supports appellants' position and the criteria set forth in R.C. 3107.02(B)(3) have been met. The record demonstrates that appellants developed a child-foster-parent relationship with the orphan while he was still a minor, that he shared in family activities which fostered the parental relationship, that appellants and their children accepted Hector as a member of the family, and that a strong sibling relationship was developed between Hector and the natural children of petitioners. I cannot perceive any state interest which would be jeopardized by the proposed adoption. To the contrary, as the court said in *Ransom v. N.Y., C. & S. L. Ry. Co.* (1915), 93 Ohio St. 223, 227: "[N]o court should pervert or divert their terms so as to defeat the sound and wholesome public policy announced in these most humanitarian laws, providing as they do children for childless parents and parents for parentless children." In sum, the Supreme Court in that case held that courts of this state should give effect to humanitarian policies in applying adoption statutes. Finally, I am not unmindful of the standard of review to be applied in the case at bar, however, I would hold that on the basis of the record in the case *sub judice,* the trial court erred in dismissing the petition for adoption and that such error constituted an abuse of discretion. I would reverse and remand the case to the trial court with instructions to grant the petition.