NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

8th Circuit Court-Keene Family Division
No. 2018-0404


IN RE J.W.


Submitted: January 10, 2019
Opinion Issued: July 3, 2019


Law Offices of Kelly E. Dowd, PLLC, of Keene (Kelly E. Dowd on the brief), for the petitioners.


Gordon J. MacDonald, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the memorandum of law), as amicus curiae.


HANTZ MARCONI, J.  The petitioners, M.F. and C.N., are unmarried, cohabitating adults who jointly petitioned to adopt M.F.'s minor biological son, J.W.  The Circuit Court (Moran, J.) ruled that RSA 170-B:4 (2014) does not authorize such an adoption and dismissed the petition.  See RSA 170-B:4 (governing who may adopt).  On appeal, the petitioners argue that the trial court erred because they are eligible to jointly adopt J.W. pursuant to RSA 170-B:4, II and III.  We affirm.

The relevant facts follow.  M.F. is the biological father of J.W., who was born in 2007.  M.F. has been in a relationship with C.N. since approximately 2008.  They live together and share two biological children but have never married.  J.W. has lived with them since approximately 2011, when M.F. was awarded primary residential responsibility of J.W.  The parental rights of J.W.'s birth mother were terminated in 2017.

M.F. and C.N. thereafter filed a joint petition to adopt J.W. They argued that their joint petition is authorized under RSA 170-B:4 because M.F. is "[t]he unmarried parent of the adoptee," RSA 170-B:4, III, and C.N. is "[a]n unmarried adult," RSA 170-B:4, II. The trial court disagreed, relying in part on our decision in In re Jason C., 129 N.H. 762 (1987). See Jason C., 129 N.H. at 765 (holding that a joint adoption application from two unmarried adults was not authorized under RSA 170-B:4, II (1977)). Consequently, the court dismissed the petition and denied the petitioners' subsequent motion for reconsideration. This appeal followed.

Adoption was unknown to the common law and is wholly statutory; therefore, our review of the law is limited to interpreting the applicable statutes enacted by the legislature. In re Estate of McQuesten, 133 N.H. 420, 422 (1990); In re Sky D., 138 N.H. 543, 545 (1994). Statutory interpretation is a question of law, which we review de novo. Petition of Carrier, 165 N.H. 719, 721 (2013). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. In re Baby Girl P., 147 N.H. 772, 775 (2002). We focus on the words of the statute because they are the touchstone of the legislature's intent. Doggett v. Town of North Hampton, 138 N.H. 744, 745 (1994). We give effect to every word of a statute whenever possible, Marcotte v. Timberlane/Hampstead School Dist., 143 N.H. 331, 339 (1999), and we presume that the legislature did not enact superfluous or redundant words, Winnacunnet Coop. Sch. Dist. v. Town of Seabrook, 148 N.H. 519, 525-26 (2002). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Carrier, 165 N.H. at 721.

We turn first to the language of the relevant statute. RSA 170-B:4 lists categories of individuals who are eligible to adopt. Jason C., 129 N.H. at 764; see RSA 170-B:4. The statute provides:

Any of the following adults may adopt:

> I. Husband and wife together.

> II. An unmarried adult.

> III. The unmarried parent of the adoptee.

> IV. A married person without that person's spouse joining as a petitioner, if the adoptee is not the petitioner's spouse; and if any one of the following circumstances apply:

>> (a) The petitioner's spouse is a parent of the adoptee and assents to the adoption;

(b) The petitioner and his or her spouse are legally separated;

(c) The failure of the petitioner's spouse to join in the petition is excused by the court by reason of prolonged unexplained absence, unavailability, or circumstances constituting an unreasonable withholding of assent; or

(d) The petitioner's spouse assents to the adoption and the adoptee is over the age of 18.

RSA 170-B:4. The petitioners' contention that they are eligible to jointly adopt J.W. is premised on their argument that the statute authorizes the joint adoption of a minor child by an unmarried parent of the child and an unrelated, unmarried adult. See RSA 170-B:4, II, III.

A brief overview of the statute gives context to our determinations below. RSA chapter 170-B, including RSA 170-B:4, was first enacted in 1973, see Laws 1973, 266:1, as part of legislation proposed by the Governor's Commission on Laws Affecting Children. See In re Adoption of Baby C., 125 N.H. 216, 221 (1984); James J. Bianco, Jr., Michael R. Chamberlain & Charles A. DeGrandpre, The New Hampshire Adoption Statute: An Overview, 18 N.H.B.J. 199, 199-201 (1977). Although RSA 170-B:4 has been amended several times since 1973, the language of paragraphs I and II has not changed, the language of paragraph III has not materially changed, and the statute's overall structure has remained the same. See Laws 1973, 266:1; Laws 1987, 343:3; Laws 1996, 46:2; Laws 1999, 18:2, 76:1; Laws 2004, 255:1. Therefore, our decision in Jason C. is instructive in construing the current version of RSA 170-B:4. See Jason C., 129 N.H. at 763-65; cf. Anderson v. Estate of Wood, 171 N.H. 524, 529 (2018) (describing presumptions we apply when the legislature amends a statute after we have construed it).

In Jason C., which required us to interpret paragraph II of RSA 170-B:4, "we look[ed] carefully at the categories of eligible petitioners to adopt" listed in the statute. Jason C., 129 N.H. at 764. We observed that these categories "include two classes of individuals described as unmarried and applying alone: an 'unmarried adult,' RSA 170-B:4, II [(1977)]; and the 'unmarried father or mother of the individual to be adopted.' RSA 170-B:4, III [(1977)]."[1] Id. (emphasis added). The other paragraphs of the statute make clear that "[m]arried applicants must apply jointly with their spouses, . . . except under narrowly limited circumstances" that are listed in the last paragraph of the statute. Id.; see RSA 170-B:4, IV. We concluded that, in using the language "[a]n unmarried adult," the legislature did not intend to authorize two unmarried adults to adopt jointly under paragraph II. Jason C., 129 N.H. at

---

[1] The language of paragraph III was changed to "[t]he unmarried parent of the adoptee" when RSA chapter 170-B was repealed and reenacted in 2004. Laws 2004, 255:1.

763-64 (quotation omitted). We held that "[r]espect for such [legislative] intent precludes our reading RSA 170-B:4, II so as to authorize a joint adoption application from two unmarried adults." Id. at 765; cf. Anderson v. Executive Dir., N.H. Retirement Sys., 166 N.H. 752, 754 (2014) ("[T]he legislature has provided that in construing all statutes, '[w]ords importing the singular number may extend and be applied to several persons or things,' RSA 21:3 (2012), 'unless such construction would be inconsistent with the manifest intent of the legislature or repugnant to the context of the same statute,' RSA 21:1 (2012)." (emphasis added)).

The petitioners contend that Jason C. is distinguishable. They argue, in part, that Jason C. addressed only whether two unmarried adults could jointly adopt pursuant to paragraph II, whereas they are seeking to jointly adopt pursuant to paragraphs II and III. The petitioners focus on paragraph III, asserting that this paragraph is "intended to permit the unmarried parent of a child to adopt the child jointly with another individual." (Emphasis added.) They reason that paragraph III must be so construed because, otherwise, it "would amount to mere surplusage, as an unmarried parent of the child, in possession of full parental rights, would have no need or reason to pursue adoption." In other words, the petitioners assume that an unmarried parent would have no reason to seek adoption of his or her child as a sole petitioner, and thus the legislature's intent in including paragraph III was to facilitate a joint adoption by the unmarried parent and another individual. We disagree.

We first note that paragraph III of the statute, like paragraph II, is phrased in the singular. See RSA 170-B:4, III ("The unmarried parent of the adoptee." (emphasis added)). Thus, in Jason C., we described an individual seeking to adopt under paragraph III as "applying alone." Jason C., 129 N.H. at 764. Although that case did not involve the application of RSA 170-B:4, III, both Jason C. and the plain language of paragraph III support the conclusion that the legislature intended to allow the unmarried parent of the adoptee to pursue the adoption as a sole petitioner. See id.; RSA 170-B:4, III.

We find further support for this conclusion in the 1971 version of the Uniform Adoption Act (UAA), from which the language of RSA 170-B:4 originates. See Unif. Adoption Act § 3 (amended 1971), 9 Part IA U.L.A. 143 (1999); Bianco, Chamberlain & DeGrandpre, supra at 201 (stating that the Governor's Commission on Laws Affecting Children used the UAA "as its basic underlying document" in drafting the 1973 legislation that created RSA chapter 170-B). When RSA 170-B:4 was first enacted in 1973, the language of paragraph III was identical to the language of section 3(3) of the UAA. Compare RSA 170-B:4, III (1977), with Unif. Adoption Act § 3(3) (amended 1971), 9 Part IA U.L.A. 143. The official comment to section 3 states, in relevant part, that the UAA "permits any unmarried father or mother to adopt his [or her] own child." Unif. Adoption Act § 3 cmt. (amended 1971), 9 Part IA U.L.A. 144; see In the Matter of Ball & Ball, 168 N.H. 133, 137 (2015) (stating that we rely

4

upon the official comments to a uniform act in interpreting that act).  Likewise, courts from other jurisdictions have recognized that section 3 of the UAA expressly permits an unmarried parent to adopt his or her own child.  See, e.g., In re J.H., 313 A.2d 874, 875 n.3 (D.C. 1974); Bridges v. Nicely, 497 A.2d 142, 145 (Md. 1985); Adoption of Adult by G.V.C., 581 A.2d 123, 125 (N.J. Super. Ct. Ch. Div. 1990).

In addition, Arkansas has construed the language of its own provision, which is modeled after the UAA, see Ark. Code Ann. § 9-9-204 (West, Westlaw through July 1, 2019); H. Keith Morrison & Patricia A. Sievers, Adoption Law in Arkansas, 53 Ark. L. Rev. 1, 2 n.3 (2000), as "clearly allow[ing] for an unmarried father to adopt his own child," King v. Ochoa, 285 S.W.3d 602, 604 (Ark. 2008), and an unmarried mother to adopt her own child, In re Adoption of M.K.C., 285 S.W.3d 605, 606 (Ark. 2008).  We similarly construe the plain language of RSA 170-B:4, III to allow an unmarried parent who is eighteen years of age or older to adopt his or her own child.  See RSA 170-B:4 (providing that only "adults" may adopt); RSA 170-B:2, I (2014) (defining "[a]dult" as "an individual who is not a minor"); RSA 170-B:2, XI (2014) (defining "[m]inor" as "any individual under the age of 18").

In arguing for a different interpretation of RSA 170-B:4, the petitioners question why an unmarried parent would have any "need or reason" to adopt his or her own child.  One reason becomes apparent when the statute is considered in the historical context within which it was originally enacted.  RSA 170-B:4, III enables an unmarried parent of a child born out of wedlock to "formalize [his or her] relationship with the child through adoption."  Bianco, Chamberlain & DeGrandpre, supra at 207.  When RSA chapter 170-B was first enacted, New Hampshire law treated a child born out of wedlock differently from a "legitimate" child in certain respects.  See, e.g., Robin C. v. Schweiker, 532 F. Supp. 677, 679 (D.N.H. 1982).  For example, a child born out of wedlock whose parents died intestate could "only inherit from the mother and her kindred, not from the father (or his kindred)."  Id.; see RSA 561:4 (1974) (amended 1983).  There were few methods by which a child could be legitimated under New Hampshire law prior to 1973.  See, e.g., Robin C., 532 F. Supp. at 679 (discussing methods).[2]  The provisions of RSA chapter 170-B thus provided another mechanism through which an unmarried natural parent could legitimate his or her child born out of wedlock, making that child "entitled to the same rights and privileges and subject to the same duties and obligations as if [the child] had been born in wedlock to the adopting parent . . . ."  RSA 170-B:20, I (1977) (current version, as amended by Laws 2004,

---

[2] Robin C. discussed RSA 460:29 (2018), which permits a "putative father of any child born out of wedlock" to "bring[ ] a legitimation petition in [superior] court."  Robin C., 532 F. Supp. at 679 (emphasis omitted) (quoting RSA 460:29, I).  RSA 460:29 was not enacted until 1977, see Laws 1977, 205:1, and thus was not in effect when RSA chapter 170-B was enacted in 1973, see Laws 1973, 266:1.

255:1, codified at RSA 170-B:25, I (2014)); see In re Jessica W., 122 N.H. 1052, 1056-57 (1982) (holding that RSA 170-B:20 (1977) did not require severance of the natural mother's parental rights and responsibilities when the "natural father adopts in order to legitimize [their] child").

Therefore, we observe that legitimation of a child born out of wedlock is one reason why an unmarried parent might seek to adopt his or her child pursuant to RSA 170-B:4, III. Accordingly, we reject the petitioners' argument that this paragraph must be intended to permit an unmarried parent to adopt jointly with another individual, as this argument is premised on the assumption that an unmarried parent "would have no need or reason to pursue adoption" of his or her own child as a sole petitioner.[3]

Additionally, the petitioners have not persuaded us that the legislature intended to allow an unmarried parent and an unmarried, unrelated adult to jointly adopt the minor child of the unmarried parent. Indeed, the petitioners' construction of RSA 170-B:4 would lead to results that the legislature clearly did not intend. As we observed in Jason C., RSA chapter 170-B "assumes that the adopted child will have one home." Jason C., 129 N.H. at 765 (quotation omitted); see, e.g., RSA 170-B:18 (Supp. 2018) (repeatedly referring to the adoptive "home" in the singular). We concluded, based on the plain language of RSA 170-B:4, that "it was the legislature's intent to confine adoption to applicants who will probably provide a unified and stable household for the child." Jason C., 129 N.H. at 764. If we agreed with the petitioners' construction, however, any "unmarried adult" would be eligible to jointly adopt with "[t]he unmarried parent of the adoptee," RSA 170-B:4, II, III, regardless of the relationship between the two petitioners, because the plain language of the statute does not impose any requirements regarding the nature of that relationship, such as whether they must cohabitate, see RSA 170-B:4. Thus, the petitioners' construction of RSA 170-B:4 is inconsistent with the legislature's intent to confine adoption to categories of individuals whom the legislature has determined "will probably provide a unified and stable household for the child." Jason C., 129 N.H. at 764; see Langevin v. Travco Ins. Co., 170 N.H. 660, 668 (2018) (declining to construe statutory provision in a manner that would be inconsistent with the legislature's intent as expressed in that statute as a whole).

The petitioners also attempt to distinguish Jason C. by arguing that the concern about "stability" expressed in that case is not present here because they have a "stable household." They point out that Jason C. involved a

---

[3] While the dissent seems to fault us, as well as the petitioners themselves, for focusing upon the fact that they brought the adoption petition jointly, we treat the petitioners as joint petitioners because that is what they ask us to do. Indeed, their statutory construction arguments are premised upon the joint nature of their petition. See Deere & Co. v. State of N.H., 168 N.H. 460, 470 (2015) (noting that "[w]e confine our analysis to the questions raised on appeal").

divorced couple seeking to jointly adopt the foster child who lived with the couple before the marriage ended, see Jason C., 129 N.H. at 763, whereas M.F. and C.N. live together, share two biological children, and are seeking to adopt M.F.'s son, who has been a member of their joint household since 2011. The dissent would similarly "limit In re Jason C. to its facts."

Our observations in Jason C., however, were made in the context of discerning legislative intent from the plain language of the statute we were interpreting. See id. at 764. That statute, RSA 170-B:4, does not allow a court to determine eligibility to adopt by assessing whether the specific facts underlying the petition to adopt indicate the existence of a stable household. Instead, the New Hampshire Legislature has determined that certain categories of petitioners "will probably provide a unified and stable household for the child" to be adopted, id., and it has chosen to confine adoption to those categories of individuals, see RSA 170-B:4.

"[P]olicy determinations as to what [eligibility] limitations apply are for the legislature, not the judiciary, to make." In re Adoption of Baby Z., 724 A.2d 1035, 1060 (Conn. 1999) (emphasis omitted); see Dolbeare v. City of Laconia, 168 N.H. 52, 57 (2015) (noting that "matters of public policy are reserved for the legislature"). Therefore, although we recognize that the modern family has taken on many different forms, it is the legislature's prerogative — subject to constitutional limitations — to limit eligibility to adopt to those categories of individuals that it believes are most likely to "provide a unified and stable household for the child" to be adopted. Jason C., 129 N.H. at 764; see Baby Z., 724 A.2d at 1060; Adoption of T.K.J., 931 P.2d 488, 496 (Colo. App. 1996) (holding that the legislature "may reasonably have determined that the best interests of children and the interests of familial stability would be promoted by limiting adoptions to situations in which: (1) the parents are completely divested of their parental rights and duties or (2) the adopting party is married to the custodial parent"). It is not our role to inquire into the wisdom or desirability of the legislature's choice. See Blackthorne Group v. Pines of Newmarket, 150 N.H. 804, 810 (2004). Rather, the question of "whether this legislative decision [to limit adoption] is or is not in keeping with the changing social mores of the public at large is the role of the democratic process and not of the courts." T.K.J., 931 P.2d at 496. Thus, if the legislature determines that eligibility to adopt should be expanded, it is free to amend the statutory scheme. See Appeal of New England Police Benevolent Ass'n, 171 N.H. 490, 497 (2018).

Finally, the petitioners raise concerns about the implications that, in their view, could arise from our construction of RSA 170-B:4, II and III. We note the scope of our decision in this case. We hold that, as currently written, RSA 170-B:4 does not authorize the joint adoption of a minor child by the unmarried parent of that child and an unmarried, unrelated adult. The petitioners do not assert that C.N. qualifies as J.W.'s "parent" or "stepparent"

for purposes of RSA chapter 170-B.  Nor are we presented with the issue raised in many of the out-of-state cases relied upon by the petitioners, in which the court considered whether to construe the jurisdiction's adoption statutes so as to permit the same-sex partner of the child's biological parent to adopt the child, without severing the biological parent's parental rights, at a time when the jurisdiction did not recognize same-sex marriage.[4]  See, e.g., Petition of K.M., 653 N.E.2d 888, 890, 898-99 (Ill. App. Ct. 1995); In re Adoption of K.S.P., 804 N.E.2d 1253, 1254, 1256-57, 1260 (Ind. Ct. App. 2004); Adoption of Tammy, 619 N.E.2d 315, 316, 318, 321 (Mass. 1993); Adoption of B.L.V.B., 628 A.2d 1271, 1272, 1276 (Vt. 1993); Mark Kleinman & Katelyn D. Wicks, eds., Legal Recognition of Same-Sex Relationships, 13 Geo. J. Gender & L. 365, 373-74, 398, 405, 413 (2012).  We note that marriage is legally available to M.F. and C.N., and there is no dispute that C.N. would be eligible to adopt J.W. as a stepparent if she and M.F. got married.  See RSA 170-B:4, IV(a); RSA 170-B:25, II (2014); see also In re Y.L., 171 N.H. 99, 100-01 (2018) (explaining that the legal relationship between the adoptee and her birth mother "would remain intact automatically" if the petitioner was married to the adoptee's birth mother (citing RSA 170-B:25, II)).  Because they are not married, however, the petitioners are not eligible to jointly adopt J.W.

While we conclude that the petitioners' remaining arguments do not warrant further discussion, see Vogel v. Vogel, 137 N.H. 321, 322 (1993), we turn to some of the points raised by our dissenting colleagues and by the State as amicus curiae.

Both the dissent and the State emphasize our previous observation that "the position of more enlightened courts . . . [is] that adoption statutes are to be considered liberally, with a view to effectuating the statutory policies."  Y.L., 171 N.H. at 102 (quotation omitted); accord Jessica W., 122 N.H. at 1057; Smith v. Consul General Of Spain, 110 N.H. 62, 64 (1969).  A court's power to liberally construe a statute, however, extends only to the degree that the statutory language reasonably allows.  N.H. Motor Transport Assoc. Employee Benefit Trust v. N.H. Ins. Guaranty Assoc., 154 N.H. 618, 623 (2006).  "[L]iberal construction does not permit a court to rewrite the statute."  T.K.J., 931 P.2d at 492; accord Appeal of Town of Lincoln, 172 N.H. ___, ___ (decided June 7, 2019) (slip op. at 8); see also In Interest of Angel Lace M., 516 N.W.2d 678, 687 (Wis. 1994) (Geske, J., concurring) (noting that the court is "still bound by the statutory requirements for adoption" despite liberal construction provision).  In our view, the dissent's reading of RSA chapter 170-B goes beyond liberal construction and effectively rewrites the statutory scheme to allow an adoption arrangement that the legislature did not authorize.

---

[4] Same-sex marriage became legal in New Hampshire in 2010.  Laws 2009, 59:1, :10; In re Guardianship of Madelyn B., 166 N.H. 453, 455 (2014); see RSA 457:1-a (2018).

For example, the dissent essentially takes the position that the circuit court can dispense with statutory requirements for adoption as long as the court determines that the proposed adoption would be consistent with the policy objectives of the statutory scheme. See RSA 170-B:1 (2014) (identifying the purposes of RSA chapter 170-B); Jessica W., 122 N.H. at 1057 (stating that the policies underlying adoption statutes in general "include promoting the best interests of children while at the same time protecting as far as possible the interests of both natural and adoptive parents" (quotation omitted)). We agree with the State, however, that the circuit court cannot grant a petition to adopt unless the statutory requirements for adoption are met. See RSA 170-B:19, VI (2014); Baby Girl P., 147 N.H. at 775; see also, e.g., T.K.J., 931 P.2d at 491 (noting that "if a proposed adoption fails to conform to statutory requirements, the effort to adopt must fail"); In re Adoption of Luke, 640 N.W.2d 374, 378 (Neb. 2002) (per curiam) ("The absence of any one of the necessary [statutory requirements] will preclude the adoption."); In re Adoption of Huitzil, 504 N.E.2d 1173, 1175 (Ohio Ct. App. 1985) (per curiam) ("[I]f the requirements of an applicable statute are not met, no adoption is possible.").

One of the statutory requirements for adoption concerns the consent of the natural parents. See RSA 170-B:5 (2014); see also Durivage v. Vincent, 102 N.H. 481, 483 (1960). In "the usual case of adoption," Jessica W., 122 N.H. at 1055, the adoptee "receives two new parents, and both of the natural parents, together with their extended families, are substituted out," Preston v. Mercieri, 133 N.H. 36, 45 (1990). Therefore, subject to certain exceptions created by the legislature, a parent who consents to the adoption of his or her child is, in effect, consenting to the termination of his or her legal relationship with that child. See RSA 170-B:11, I (2014); RSA 170-B:25 (2014).

Generally speaking, consent to a proposed adoption must be obtained from the birth mother, the legal father, and, in certain circumstances, the birth father. Baby Girl P., 147 N.H. at 775; RSA 170-B:5, I. Except in cases of stepparent adoption, the consent of the persons listed in RSA 170-B:5, I, takes the form of a surrender of parental rights executed in accordance with the statutory requirements. See RSA 170-B:9, :10 (2014). Consent is not required, however, from persons who fall within one of the categories listed in RSA 170-B:7 (2014); for example, a person whose parental rights to the proposed adoptee have already been terminated by court order. See RSA 170-B:7, II, V, VI.

In cases where a stepparent seeks to adopt the child of his or her spouse, the parent married to the adopting stepparent must assent to the adoption, see RSA 170-B:4, IV(a), but need not execute a surrender of parental rights because that parent's legal relationship with the child will remain intact after the adoption, see RSA 170-B:25, II; Jessica W., 122 N.H. at 1056; Preston, 133 N.H. at 45. The legislature has thus created a "stepparent exception" to the general rule that adoption severs the adoptee's legal relationship with both

9

natural parents.  See RSA 170-B:25, II; Jessica W., 122 N.H. at 1056; McQuesten, 133 N.H. at 422-23.

The legislature created a second exception to this general rule in RSA 170-B:25, III.  In Y.L., we held that, pursuant to this exception, an adult female could be adopted by an unmarried adult male without severing her legal relationship with her birth mother.  See Y.L., 171 N.H. at 100-02.  "The adoption of an adult, however, must be distinguished from the adoption of a minor," id. at 101, and the statutory scheme reflects those distinctions by treating adult adoptions differently, see, e.g., RSA 170-B:7, IV; RSA 170-B:19, III, IV (2014).  Thus, we disagree with the dissent that the question posed in Y.L., which involved an adult adoption, is similar to the issue in this case involving the proposed adoption of a minor.

The State correctly notes that the legislature has only created two exceptions to the general rule that adoption severs the adoptee's legal relationship with both natural parents.  See RSA 170-B:25, II, III.  To the extent the dissent relies upon the stepparent exception, we disagree that this exception applies here.  As noted above, C.N. is not married to J.W.'s parent, nor do the petitioners even argue that C.N. qualifies as J.W.'s "stepparent" for purposes of RSA chapter 170-B.  Furthermore, as the State acknowledges, this case is factually distinguishable from Jessica W., where we liberally construed the stepparent exception to permit the birth mother of the child to retain her parental rights where the unmarried natural father adopted in order to legitimate their child.  Jessica W., 122 N.H. at 1055-57.  As we have explained above, the legislature intended to allow unmarried parents to legitimate their children through the adoption process.  See Bianco, Chamberlain & DeGrandpre, supra at 207.  Thus, liberally construing the stepparent exception to cover this situation effectuates the legislature's intent.  See Baby Z., 724 A.2d at 1061 (explaining that "the statute at issue is construed liberally in order to effectuate the intent of the legislature" (emphasis omitted)).  By contrast, applying the stepparent exception in this case would effectively revise the legislature's choice to limit adoptions in the manner we have already discussed.  Respect for legislative intent precludes us from doing so.  See Jason C., 129 N.H. at 765.

We conclude that, because neither exception applies, under the current statutory scheme, C.N. — an unmarried, unrelated adult — cannot adopt M.F.'s minor child unless M.F. surrenders his parental rights to the child.  See RSA 170-B:5, I; RSA 170-B:16, III (2014); RSA 170-B:19, IV.  Because M.F. has not surrendered his parental rights to J.W. (and does not intend to), the statutory requirements for adoption are not met.  See RSA 170-B:19, IV, VI.  When the statutory requirements are not met, the court does not reach the merits of the adoption petition.  See Angel Lace M., 516 N.W.2d at 681 (explaining that the court must determine whether the proposed adoption

10

satisfies the statutory requirements for adoption before it reaches the best interest inquiry).

The dissent posits that the proposed adoption arrangement can be achieved in this case because it reads RSA 170-B:19, IV as providing the circuit court with "discretion to authorize C.N.'s adoption of J.W. and excuse the surrender of M.F.'s parental rights because doing so would be in J.W.'s best interest." See RSA 170-B:19, IV (stating court may grant petition to adopt a minor child if it determines, inter alia, "that the required surrenders have been obtained or excused and that the adoption is in the best interest of the adoptee" (emphasis added)). In effect, the dissent construes RSA 170-B:19, IV as allowing the court, in its discretion, to "excuse" the effect of RSA 170-B:25, which severs the legal relationship between the adoptee and his or her birth parents except in limited circumstances that are not present here.

We are generally reluctant to address issues that the parties have neither raised nor briefed. See LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 91 (2007); see also Hodges v. Johnson, 170 N.H. 470, 490 (2017) (Bassett, J., dissenting) ("Deciding issues that have not been briefed undermines our adversary process and increases the possibility that we will err."). Nonetheless, we disagree that RSA 170-B:19, IV allows C.N. to adopt J.W. without affecting J.W.'s legal relationship to M.F. The court's excusal of a parent's required surrender does not mean that the parent's rights are unaffected by the adoption; it merely means that the adoption petition can be heard by the court. See RSA 170-B:19, IV, VI. Notably, the court's excusal of the surrender does not change the legal effect of the adoption decree under RSA 170-B:25. Subject to the two exceptions described above, the adoption decree severs the legal relationship between the adoptee and his or her birth parents. See RSA 170-B:25; Y.L., 171 N.H. at 100-02. As we have explained, neither exception applies here; therefore, the dissent's reliance on RSA 170-B:19, IV is misplaced.

We reiterate that legislative intent is the touchstone of our inquiry in matters of statutory interpretation, including the interpretation of adoption statutes. See Y.L., 171 N.H. at 101-02 (examining the legislature's intent and construing the relevant adoption statutes consistent with this intent); Jason C., 129 N.H. at 764-65 (construing adoption statute in accordance with the legislature's intent). Therefore, although the petitioners "have presented a factual record that may warrant sympathetic consideration of their adoption [petition]," this cannot transcend the limits the legislature has placed on adoption. Baby Z., 724 A.2d at 1060; see In re Guardianship of Eaton, 163 N.H. 386, 393 (2012). We note that the legislature has been willing to reexamine the adoption statutes on a number of occasions to address asserted shortcomings. See, e.g., Laws 1999, 76:1 (amending RSA 170-B:4 to allow a married petitioner to adopt another adult with the consent of the petitioner's spouse); Laws 2006, 200:6, :10, :11 (amending RSA 170-B:11 and RSA 170-

B:25 to address inheritance rights in a situation where the adoptee dies before the final decree of adoption is issued). In other words, "our legislators [have] continue[d] to work to advance the interests and protection of our children by listening to their constituents, reviewing our current laws, and debating the wisdom of statutory changes." Angel Lace M., 516 N.W.2d at 687 (Geske, J., concurring). We are confident that the legislature will carefully consider the policy concerns raised by the petitioners and relied on by the dissent if the legislature deems them to be meritorious.

Affirmed.

LYNN, C.J., and DONOVAN, J., concurred; HICKS and BASSETT, JJ., dissented.

HICKS and BASSETT, JJ., dissenting. Because we would interpret our adoption statutes to allow the contemplated adoption in this case to take place, we respectfully dissent. Like the State, we believe "that a liberal construction of the adoption statute" allows petitioner C.N. to adopt J.W., the minor son of her domestic partner, petitioner M.F., "without requiring [M.F.] to surrender his parental rights over J.W., so long as both [M.F.] and C.N. consent to the adoption arrangement and the trial court finds that the adoption is in J.W.'s best interests."

The petitioners are unmarried, domestic partners and, together, are the biological parents of two children. M.F. and C.N. have been together since approximately 2008. M.F. is also the biological father of J.W., a minor, who was born in December 2007. See RSA 170-B:2, XI (2014) (defining a "minor" for the purposes of adoption law as an individual "under the age of 18"). In addition, M.F. is J.W.'s legal father, having been named on J.W.'s birth certificate. See RSA 170-B:2, X(a) (2014). The parental rights of J.W.'s biological mother were terminated in 2017. J.W. has resided with M.F. and C.N. since approximately 2011.

In 2018, the petitioners jointly filed a petition to adopt J.W. Their petition was jointly filed, even though M.F. has, in his attorney's words, "full parental rights" with respect to J.W. C.N. petitioned under RSA 170-B:4, II, which allows "[a]n unmarried adult" to adopt. RSA 170-B:4, II (2014). M.F. purported to do so pursuant to RSA 170-B:4, III, which allows "[t]he unmarried parent of the adoptee" to adopt. RSA 170-B:4, III (2014).

At the hearing on their motion, the petitioners' attorney explained the petition was brought jointly so as to allow M.F. to retain his parental rights:

> If I brought a petition solely in [C.N.'s] name, it would seem that [M.F.] would have to terminate his parental rights for that to get finalized. So I brought a joint petition with [M.F. and C.N.], who

12

are not married but have been in a family unit for over a decade at this point and have two children in common.

. . . .

So I'm trying to get clarification from the Court. . . . [I]f the Court says they need to be married, I will have a conversation with my clients about that. If the Court says we could bring it in [C.N.'s] name and we can waive the termination of [M.F.'s] rights, then we can do that.

Ultimately, the trial court dismissed the petition on the ground that RSA chapter 170-B "does not authorize an adoption application from an unmarried adult when a biological parent is not surrendering his parental rights." In effect, the trial court ruled that the outcome that the petitioners sought — that C.N. would adopt J.W., and M.F. would retain his parental rights — was not possible under the current statutory scheme.

The petitioners and our colleagues focus upon the fact that M.F. and C.N. brought the adoption petition jointly. We believe that focus is mistaken. New Hampshire is a notice pleading jurisdiction and, as such, we take a liberal approach to the technical requirements of pleadings. Porter v. City of Manchester, 151 N.H. 30, 43 (2004). Although the petition in this case was filed jointly, M.F. cannot "adopt" J.W. because he already has full, parental rights over him. Thus, we believe that the petition, properly viewed, is a petition by C.N. alone. As the petitioners' attorney explained, the petition was brought jointly in an attempt to ensure that M.F.'s parental rights over J.W. remain intact.

Like the State, we believe that this case requires us to answer a question similar to that posed in In re Y.L. See In re Y.L., 171 N.H. 99, 100 (2018). In In re Y.L., we were asked whether, under New Hampshire's adoption statute, the petitioner, an unmarried man, could adopt an adult female without altering the legal parental status of the adult female's birth mother, a result that all three desired. Id. In the instant matter, we are asked whether, C.N., an unmarried woman, may adopt J.W., a minor, without altering the legal parental status of J.W.'s father, M.F. Contrary to the trial court and our colleagues, we believe that she may.

As an unmarried adult, C.N., "is plainly eligible to adopt under our state's adoption statute." Id.; see RSA 170-B:4, II. "Basic, also, is that if the adoption is approved, [J.W.] will be considered the child of [C.N.], entitled to the same rights and privileges and subject to the same duties and obligations as if [he] had been born to [her]." In re Y.L., 171 N.H. at 100; see RSA 170-B:25, I (2014). "And, finally, because the statute contemplates a child having, at most, two legal parents at any given time, it is straightforward that [J.W.]

13

may not maintain [his] legal relationship with <u>both</u> of [his] birth parents if adopted by [C.N.]." <u>In re Y.L.</u>, 171 N.H. at 100.

Not as clear under our adoption statute, though, is whether J.W. may maintain his legal relationship with M.F. after being adopted by C.N. <u>See id</u>. That relationship would remain intact were C.N. and M.F. married. <u>See id</u>. In that case, C.N. would be J.W.'s stepmother, and when a child is adopted by a stepparent, the child's relationship to the child's birth parent (who is married to the stepparent) "shall in no way be altered by reason of the adoption." RSA 170-B:25, II (2014); <u>see also</u> RSA 170-B:4, IV(a) (2014) (allowing a married person to petition to adopt without joining his or her spouse when the spouse is the parent of the adoptee and assents to the adoption).

Here, similar to the situation in <u>In re Y.L.</u>, the statutory scheme does not explicitly tell us whether the relationship between J.W. and M.F. may survive when, as in this case, the adopting parent (here, C.N.) is unmarried. <u>See In re Y.L.</u>, 171 N.H. at 101. We believe that our adoption statutes allow C.N. to adopt as an unmarried woman and M.F. to retain his parental rights. In our view, "it is preferable to take the position of more enlightened courts, that adoption statutes are to be construed liberally, with a view to effectuating the statutory policies" that underlie them. <u>Smith v. Consul General Of Spain</u>, 110 N.H. 62, 64 (1969) (quotation omitted); <u>see In re Y.L.</u>, 171 N.H. at 102. Allowing M.F. to retain his parental rights when C.N. adopts J.W. furthers the state policy of protecting an adoptive child, here, J.W., from "unnecessary separation" from the only parent who currently has parental rights over him, M.F. RSA 170-B:1, I (2014).

We agree with the State that the fact that J.W. is a minor does not change the analysis. Although the adoption statute generally "requires the parental rights of a minor's birth parent or parents to have been either surrendered or terminated before an adoption is finalized," <u>In re Y.L.</u>, 171 N.H. at 101, that requirement cannot be interpreted as applying to a stepparent adoption. <u>See</u> RSA 170-B:5, I (2014) (enumerating categories of individuals from whom a surrender of parental rights must be obtained "[u]nless excused pursuant to RSA 170-B:7"), :7 (2014) (exempting certain categories of individuals from the requirement to execute a surrender of parental rights). Were it to apply, then RSA 170-B:25, II, which permits the birth parent spouse to retain parental rights in a stepparent adoption, would be rendered a nullity. <u>See Garand v. Town of Exeter</u>, 159 N.H. 136, 141 (2009) ("The legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect." (quotation omitted)); <u>Wolfgram v. N.H. Dep't of Safety</u>, 169 N.H. 32, 36 (2016) ("We will not construe a statute in a way that would render it a virtual nullity." (quotation omitted)). Reading RSA 170-B:5, I, :7, and :25 together, as we must, requires us to conclude that a birth parent married to an adopting spouse in a stepparent adoption need not surrender his or her parental rights before an adoption is

finalized.  See Petition of Carrier, 165 N.H. 719, 721 (2013) ("We construe all parts of a statute together to effectuate its general purpose and avoid an absurd or unjust result.").

Nor should the statutory scheme be interpreted to require such a surrender in the instant case, even though C.N. is not J.W.'s stepparent.  RSA 170-B:19, IV (2014) allows the court to authorize the adoption of a minor when the court "determines that the required surrenders have been obtained or excused and that the adoption is in the best interest of the adoptee."  In our view, the court has the discretion to authorize C.N.'s adoption of J.W. and excuse the surrender of M.F.'s parental rights because doing so would be in J.W.'s best interest.

As the State aptly observes, our conclusion is further supported by In re Jessica W., 122 N.H. 1052 (1982).  In that case, the court concluded that what is now RSA 170-B:25, II had to be interpreted liberally so as to allow a child to be legitimated by his natural father without losing his relationship with his mother.  In re Jessica W., 122 N.H. at 1056-57.  The court agreed with the reasoning of another court that a child's "best interests are served by permitting the natural father to adopt in the same manner as if the petitioning father were the stepfather of the adoptive child by marriage to the natural mother."  Id. at 1056 (quotation omitted).  Just as a "child should not have to be deprived of its relationship with its mother in order to be legitimized by its natural father through the adoption process," so too should a child not have to be deprived of his relationship with his biological, legal father in order to be adopted by his father's long-term, domestic partner, the mother of the child's half-siblings.  Id.

Although we do not believe that, properly viewed, the petition in this case is truly a "joint" petition, even if it were, we disagree with the majority that our decision in In re Jason C., 129 N.H. 762 (1987), would preclude it.  In In re Jason C., the issue was whether two, unmarried adults who lived in separate households could jointly petition to adopt a child.  In re Jason C., 129 N.H. at 763-64.  On its face, the statutory language would have allowed the joint petition.  See id. at 763.  One provision allowed "an unmarried adult" to adopt; another stated that singular terms in the adoption statute included "the plural when consistent with the intent of the chapter."  Id. (quotations, brackets, and ellipsis omitted); see RSA 21:3 (Supp. 2018) (providing that "[w]ords importing the singular number may extend and be applied to several persons or things").  The court ruled that "it was the legislature's intent to confine adoption to applicants who will probably provide a unified and stable household for the child."  In re Jason C., 129 N.H. at 764.  Because the two, unmarried adults in In re Jason C. maintained separate households, requiring custody and perhaps visitation issues to be addressed if the joint adoption petition were allowed, the court ruled that allowing the petition was inconsistent with the statute's

purpose, and declined to interpret the statute as authorizing the joint petition. Id. at 764-65.

Although the court in In re Jason C. used language implying that two, unmarried adults could not jointly adopt under any circumstances, that language is dicta and, more importantly, is based upon a rationale that is no longer true. The court in In re Jason C. reasoned that two unmarried applicants could not be allowed to adopt jointly because, if they could, the trial court would lack jurisdiction to decide custody issues. Id. The court observed that RSA chapter 170-B made no provision for custody determinations in such a case and that "RSA 458:17 . . . simply empowers the superior court to make custody orders in divorce and annulment cases." Id. at 765.

Since In re Jason C. was decided, however, RSA 458:17 was repealed and RSA 461-A:3 now provides that the court has jurisdiction to decide parental rights and responsibilities when "unwed parents are living apart." RSA 461-A:3, II (2018); see Laws 2005, 273:1, :20 (enacting RSA chapter 461-A and repealing RSA 458:17, among other provisions in RSA chapter 458). Thus, while it may well be that when In re Jason C. was decided, we could properly say that the legislature did not intend "to authorize adoption in circumstances in which custody disputes would be likely to arise, or indeed could arise, independently of the superior court's domestic relations jurisdiction under RSA chapter 458," that rationale no longer applies. In re Jason C., 129 N.H. at 765.

Given that an important rationale underlying the holding of In re Jason C. is no longer true, we would limit In re Jason C. to its facts. In other words, we would interpret In re Jason C. narrowly to preclude two, unmarried adults from jointly adopting a child only when to do so would contravene legislative intent that applicants provide a unified and stable household for the child. See id. at 764. Under our reading of In re Jason C., if neither C.N. nor M.F. were J.W.'s parent, and they sought to jointly adopt, we believe that they could do so because their adoption of J.W. would further that legislative intent. The statute specifically allows unmarried adults to adopt. See RSA 170-B:4, II. The general rules of statutory construction provide that the singular may include the plural. See RSA 21:3. And, allowing such an adoption would be consistent with the legislature's purpose of confining adoption to applicants who will provide a unified and stable household for the child. See In re Jason C., 129 N.H. at 765.

For all of the above reasons, therefore, we respectfully dissent from the majority opinion.